JACQUELINE PATCH, Indiv. and as Adm'r of the Estate of Charles P. Patch, Deceased, Plaintiff-Appellee and Cross-Appellant, v. GRANGE J. GLOVER et al., Defendants (Jackson Park Hospital, Defendant and Cross-Appellee; Pratap C. Kumar, Defendant-Appellant and Cross-Appellee).

First District (4th Division)   No. 1—91—2252

Opinion filed June 10, 1993.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Kevin J. Glenn, Kimberly A. Wilkins, and Edward A. Wilkins, of counsel), for appellant.

Laser, Schostok, Kolman & Frank, of Chicago (Stephen J. Schostok and Michael Lee Tinaglia, of counsel), for appellee Jacqueline Patch.

Peterson & Ross, of Chicago (James M. Bream, Thomas A. Morrissey, and Sandra L. Wright, of counsel), for appellee Jackson Park Hospital.

JUSTICE HOFFMAN delivered the opinion of the court:

On October 10, 1981, Charles P. Patch fell from the second-floor landing of a building at 7009 S. Chappel, in Chicago, Illinois. As a result, Patch was injured and taken to Jackson Park Hospital (Jackson Park), where he was treated by Dr. Pratap Kumar and Dr. Mikal Ramadan. Patch died in the hospital two days later. He was survived by his wife, Jacqueline Patch, and three adult children, Jacqueline Patch Whiteside, Terry Patch, and Philip Patch.

Plaintiff, Jacqueline Patch, as administrator of Patch's estate, brought suit against Jackson Park, Dr. Kumar, and the owners and managers of the building where Patch fell: Grange J. Glover, Anna M. Glover, John J. Sarac, Elizabeth Sarac, and Orner, Shane & Rizner, Inc. (collectively referred to as the real estate defendants). Count I of plaintiff's second-amended complaint was a wrongful death action against the real estate defendants alleging that they were negligent in maintaining the stairway from which Patch fell. Count II, also a wrongful death action, sought recovery from all defendants for the medical negligence of Dr. Kumar and Jackson Park through its employee, Dr. Ramadan. Count III was a survival action against all defendants.

Jackson Park filed a third-party complaint against Dr. Ramadan for indemnity and contribution. The indemnity claim was severed from the underlying action; the contribution claim was dismissed.

Plaintiff settled her claims against the real estate defendants for $75,000. Pursuant to the real estate defendants' motion, the trial court found that the settlement was in good faith under section 2 of the Contribution Act (Ill. Rev. Stat. 1991, ch. 70, par. 302) and dismissed them.

After the settlement, plaintiff filed a third-amended complaint against Jackson Park and Dr. Kumar. Count I was a wrongful death action and count II was a survival action. Both counts were based on medical negligence.

The case was tried before a jury. The trial court refused plaintiff's tendered instruction relating to the survival action and, in essence, granted defendants a directed verdict on that count. The jury found in favor of plaintiff and against Dr. Kumar on the wrongful death action and assessed plaintiff's damages at $50,000. The jury also found in favor of Jackson Park and against the plaintiff. The trial court entered judgment on the verdict.

Dr. Kumar moved to reduce the judgment entered against him claiming a right to a setoff under section 2(c) of the Contribution Act

(Ill. Rev. Stat. 1991, ch. 70, par. 302(c)) due to plaintiff's settlement with the real estate defendants. The trial court denied Dr. Kumar's motion and he appeals from that order.

Plaintiff filed a post-trial motion seeking a variety of relief ranging from judgment notwithstanding the verdict to a new trial on the issue of damages only. Plaintiff's motion was denied and she now appeals.

Opinion

For his part, Dr. Kumar claims the trial court erred in failing to grant him a setoff in the amount of the real estate defendants' settlement with plaintiff.

For her part, plaintiff makes the following assignments of error: (1) the trial court excluded expert testimony on the value of loss of society; (2) the court excluded the alleged admissions in Jackson Park's third-party complaint against Dr. Ramadan; (3) the court allowed evidence that Patch was intoxicated when he was admitted to the hospital; and (4) the court denied her motion for a new trial on damages.

We will first address plaintiff's arguments.

Plaintiff contends that the trial court erred when it barred her economics expert, Stanley Smith, from offering testimony as to the value of the loss of society sustained by plaintiff and the children on Patch's death. Prior to trial, both Dr. Kumar and Jackson Park filed motions *in limine* to bar plaintiff from eliciting testimony from Smith as to the value of the loss of Patch's ability to enjoy life and the value of the loss of society sustained by reason of his death.

Prior to granting the motions, a *voir dire* examination of Smith was conducted. Smith testified he was an economist retained by plaintiff to render opinions on certain elements of damage sustained as a consequence of Patch's death: (1) the value of wages and fringe benefits lost; (2) the value of the loss of Patch's ability to enjoy the full value of life; and (3) the value of the loss of Patch's society and companionship. Defendants stipulated to Smith's expertise to testify as to the value of lost wages and fringe benefits. As to Smith's opinions relating to Patch's loss of his ability to enjoy the full value of life, because the jury only considered plaintiff's wrongful death claim, any damages sustained by Patch personally are irrelevant. The measure of damages recoverable in a wrongful death action is limited to the pecuniary loss to the spouse and next of kin of the decedent. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 170 N.E.2d 163.) Our analysis is restricted to

Smith's opinions on the value of the loss of society sustained by plaintiff and the children.

Smith testified during his *voir dire* examination that, in his opinion, the value of the loss of society and companionship sustained by Patch's surviving family was about $819,000. He arrived at this figure through what he termed was the "willingness to pay methodology." Smith stated that by examining available data, he concluded, based on the amount of money that American society spends on average to save lives, the "statistically average" person, a 31-year-old with a life expectancy of 45 more years, has a value to society of $2.3 million. That net figure excludes the amount of money the person would have earned in his lifetime. According to Smith, most of the $2.3 million nonmonetary value of the statistically average person is captured by those people who have a direct, palpable, and immediate relationship with the individual. The group includes the spouse, children, siblings, parents, grandparents, aunts, "close family[,] loved ones," and close friends. To this gross value figure, Smith applied a factor based on the decedent's remaining life expectancy, as determined by sex, race, and age at the time of death, to arrive at the value of the loss of society sustained in any given case. Smith admitted, albeit reluctantly, that as applied, the value of the loss of society sustained by the survivors of any person of the same sex, race, and age as Patch would be the same.

The admission of evidence is a matter largely within the discretion of the trial court, and its rulings will not be disturbed on appeal absent an abuse of discretion. (*Jackson v. Pellerano* (1991), 210 Ill. App. 3d 464, 569 N.E.2d 167.) Plaintiff argues that the trial court abused its discretion when it barred Smith's testimony on the value of the loss of society. In support of this argument, plaintiff contends that Smith's opinions are based on accepted economic principles and were both relevant and admissible. Assuming, *arguendo*, that Smith's opinions on the value of loss of society are, in fact, based on accepted economic principles, we will analyze their relevance and admissibility.

The parties do not dispute that loss of society is a component of pecuniary injuries recoverable in a wrongful death action. (*Johnson v. Village of Libertyville* (1986), 150 Ill. App. 3d 971, 502 N.E.2d 474.) To be relevant, evidence must establish a fact of consequence to the determination of the pending action; it must be both material and have probative value. (*In re Elias* (1986), 114 Ill. 2d 321, 499 N.E.2d 1327.) Even if evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury. See M. Gra-

ham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 169 (5th ed. 1990).

Recovery under the Wrongful Death Act (Ill. Rev. Stat. 1991, ch. 70, par. 1 *et seq.*) is circumscribed both quantitatively and qualitatively. The Act limits recovery to the pecuniary injuries suffered as a consequence of the decedent's death (the quantity) by the decedent's spouse and next of kin (the quality). In a variety of contexts, courts of review in this State have held that damages for loss of society are difficult to estimate exactly and no standard of value applies; rather, their assessment is committed to the sound discretion of the jury as to what is reasonable under the circumstances of any given case guided by its observations, experience, and sense of fairness. (See *Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 578 N.E.2d 970; *Elliott v. Willis* (1982), 92 Ill. 2d 530, 442 N.E.2d 163; *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 460 N.E.2d 464; *Bohnen v. Wingereid* (1979), 80 Ill. App. 3d 232, 398 N.E.2d 1204.) To be sure, expert testimony is admissible when it will assist the jury even as to matters within the common knowledge of the average juror. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246; *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.) But when the expert's testimony does not aid the jury to determine the questions at issue, it will not be admitted. *Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 382 N.E.2d 1201.

■ We believe that Smith's proffered testimony on the value of the loss of society was marginally relevant, potentially confusing, and misleading. The jury's task was to assess the value of the loss of society sustained by plaintiff and the children as Patch's spouse and next of kin. Smith's valuations speak to the noneconomic societal value of the statistically average person, not Patch. The only attributes of Patch that entered into Smith's calculations were his age, sex, and race.

Smith admits that the value society places on the nonmonetary contribution of the statistically average person inures to the benefit of those who have an immediate relationship with the person. Smith includes within this group the person's family and close friends. But the Wrongful Death Act provides a recovery to a clearly defined group: the decedent's spouse and next of kin. When, as in this case, the decedent is survived by his children, the group of beneficiaries under the Act does not include the decedent's parents, siblings, aunts, or uncles. And under no circumstances does the group of beneficiaries include the decedent's close friends. The type of evidence that Smith offered

would, out of necessity, provoke an extended line of inquiry into Patch's relationships with family members and friends, who are not entitled to recover under the Act, so that their loss of society could be factored out of the gross value of the loss of society. All of which would serve no purpose other than to distract the jury from its real task, which is to apply their collective common sense to assess the value of the society lost by plaintiff and the children. Moreover, Smith's testimony on this issue would mislead the jury into believing the false notion that the distinct and personal relationship that one has with his wife and children has commercial value which can be determined by a comparison to the value that society places on the nonmonetary contributions of the statistically average person. It is our belief that the type of evidence that plaintiff sought to introduce through Smith's testimony would be the antithesis of a reasonable and practical consideration of the fair and just compensation for the loss of society suffered by the spouse and next of kin of a decedent under the peculiar facts of any given case. The cornerstone of our civil justice system is the faith that we place in our juries and the notion that when properly instructed they will, by the impartial exercise of their collective conscience and sound judgment, determine reasonable compensation for noneconomic damages. Our juries have been admirably discharging this difficult task for over 200 years without the aid of experts, and we believe that they should continue to do so. Hence, we agree with the court in *Fetzer v. Wood* (1991), 211 Ill. App. 3d 70, 569 N.E.2d 1237, when it found that juries are in a better position to decide what is fair and just compensation for loss of society without imposing an expert's theory as to value. As a consequence, we find that the trial court did not abuse its discretion when it excluded Smith's testimony on the value of the loss of society sustained on Patch's death.

Plaintiff next argues that it was error for the trial court to bar her from introducing into evidence Jackson Park's third-party complaint against Dr. Ramadan as an admission of the facts alleged therein. Plaintiff contends that because the allegations against Dr. Ramadan in the third-party complaint are "complete, unequivocal and unconditional" and, further, because the allegations are not phrased hypothetically or in the alternative, they should have been admitted as admissions on the part of the pleader, Jackson Park. We disagree.

In its answers to plaintiff's first-amended and second-amended complaints, Jackson Park denied the allegations that its employees, including Dr. Ramadan, were negligent in treating Patch. Subsequently, Jackson Park filed a third-party unverified complaint against

Dr. Ramadan for indemnity and contribution. Prior to trial, Jackson Park sought and received an *in limine* order which barred plaintiff from introducing evidence of the third-party complaint or from making reference to its allegations in front of the jury.

■ Actions for indemnity and contribution are, by their very nature, contingent claims; each is contingent on the party seeking the relief first having been found liable in tort to the plaintiff in the underlying action. Therefore, to determine whether a complaint seeking indemnity or contribution is an alternative pleading, the court must consider the pleadings between the party seeking indemnity or contribution and the plaintiff in the underlying action. If the party seeking indemnity or contribution has denied in its answer to the underlying complaint the very same facts that form the basis of its claim for indemnity or contribution, then the allegation of those facts, regardless of whether they are phrased hypothetically or in the alternative, are alternative in nature and cannot be used in the underlying action as admissions against the pleader. See *Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 462 N.E.2d 645; Ill. Rev. Stat. 1991, ch. 110, par. 2—613(b).

Trial judges have a duty to examine the pleadings in sequence of issue formation to prevent distorting an alternative pleading into an admission or converting a contingent allegation into an unconditional one. The trial judge in this case discharged that duty ably, and we concur in his conclusion that Jackson Park's third-party complaint against Dr. Ramadan was pled in the alternative to its answer to plaintiff's complaint and, as such, could not be introduced as an admission of the facts alleged therein.

Plaintiff also argues that the trial court erred when it allowed evidence that Patch was intoxicated when he was admitted to the hospital because it was irrelevant and highly prejudicial. It is true, as plaintiff argues, that evidence of a patient's intoxication in a medical negligence action is irrelevant and inflammatory when it has no bearing on the issue of whether the defendants breached the standard of care. (*Jackson v. Pellerano* (1991), 210 Ill. App. 3d 464, 569 N.E.2d 167.) But the corollary to that proposition is that evidence of a patient's intoxication is both relevant and admissible in a medical negligence action when intoxication impacts on the question of a breach of the standard of care.

■ In her third-amended complaint, plaintiff charged that Dr. Kumar breached the standard of care in treating Patch by, *inter alia,* failing to diagnose or treat the condition of a lacerated and injured spleen and kidney. In support, plaintiff offered the testimony of her

expert witness, Dr. Richard Printz, who opined that Dr. Kumar deviated from the standard of care because he failed to recognize that Patch was bleeding internally. Dr. Printz further opined that if an operation had been performed on Patch earlier, he could have survived.

Dr. Kumar countered with the testimony of his expert witness, Dr. Coleman Seskind, who testified that in his opinion Dr. Kumar's treatment of Patch conformed to the applicable standard of care. In support, Dr. Seskind testified that at the time Patch was hospitalized he was acutely intoxicated, which complicated a diagnosis of his condition. It affected Patch's ability to give an accurate history, to tell Dr. Kumar how he felt, or to explain if he experienced any change in condition. Dr. Seskind further testified that Patch's intoxication affected his ability to survive an operation. It was his opinion that if Dr. Kumar had recommended surgery earlier than it was actually performed, Patch "would have died on the table."

As a result, Patch's intoxication was both relevant and admissible because it addressed whether Dr. Kumar breached the standard of care.

In her last argument, plaintiff contends that the jury's award of $50,000 in damages was manifestly inadequate and could only have been the result of prejudice or complete disregard of proven elements of recoverable damages.

The assessment of damages is a matter committed to the sound discretion of the jury and a court will not substitute its judgment on the issue unless the jury's award is contrary to the manifest weight of the evidence. (*Johanek v. Ringsby Truck Lines, Inc.* (1987), 157 Ill. App. 3d 140, 509 N.E.2d 1295; *Voss v. Tune* (1984), 121 Ill. App. 3d 692, 460 N.E.2d 51.) A jury's award of damages is contrary to the manifest weight of the evidence when it is palpably inadequate as a consequence of passion or prejudice or when the jury disregards proven elements of damages. *Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 485 N.E.2d 4; *Barr v. Groll* (1991), 208 Ill. App. 3d 318, 567 N.E.2d 13.

Plaintiff contends that in awarding damages, the jury disregarded both the testimony relating to plaintiff's loss of support and the presumption of a substantial pecuniary loss to plaintiff, as a surviving spouse, and the children, as the next of kin.

Plaintiff testified that Patch was contributing about $100 every other week to her support. The evidence reflects that Patch was not contributing to the support his three adult children. In support of her claim of loss of support, plaintiff relied on Smith, who opined that had Patch lived and continued working to the end of his

statistical life expectancy, 13.8 years after his death, he would have had $247,339 available to contribute to the support of others. On cross-examination, Smith admitted that although Patch had a statistical life expectancy of 13.8 years at the time of his death, his statistical work life expectancy was only 2.3 years when he died. Smith admitted that if Patch only worked to the end of his statistical work life expectancy, he would have had $30,845 available to contribute to the support of others. Smith admitted that his statistical analysis did not take into account the actual contributions that Patch had made to support plaintiff prior to his death; rather, he prepared an analysis of the amount of money Patch would have had available to contribute to the support of others. He acknowledged that based on plaintiff's testimony of the sums Patch had given to her prior to his death, Patch was giving plaintiff about 20% of the total amount that he had available to contribute to the support of others. Based on the testimony of plaintiff's own expert, the jury could have assessed plaintiff's loss of support damages from a low of $6,169 (20% of $30,845) to a high of $247,339.

As to the damages for loss of society, the jury was exposed to contradictory evidence. To be sure, as plaintiff argues, there is a presumption of substantial pecuniary loss when a husband and father dies; however, the presumption is rebuttable. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 505 N.E.2d 1239.) Plaintiff testified that she and Patch had been separated for about two years before he died; however, one of the children testified that his parents had not lived together since 1955 or 1956. In her answer to an interrogatory, which was read to the jury, plaintiff stated that she and Patch were estranged. The jury also heard the testimony of Dorothy Jones, who stated that Patch ate most of his meals at her home and often slept there. Jones accompanied Patch to the hospital after his injury. Plaintiff did not visit Patch while he was in the hospital. Jones, who had been Patch's friend for about two years, only saw Patch with one of his children, Philip. Philip Patch did not testify at trial.

It is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses, and draw the ultimate conclusion as to the facts. (*Finley v. New York Central R.R. Co.* (1960), 19 Ill. 2d 428, 167 N.E.2d 212.) After weighing the evidence in this case, as viewed in a light most favorable to Dr. Kumar (see *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 458 N.E.2d 530), we are unable to conclude that the jury acted out of prejudice or failed to consider proven elements of damages. The jury was properly

instructed on the measure of damages, it heard the evidence and judged the credibility of the witnesses, and we will not substitute our judgment for the jury's on the amount of damages that should be awarded. (See *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 349 N.E.2d 413.) For these reasons, we find the trial court did not err in denying plaintiff's request for a new trial based on inadequate damages.

We now address Dr. Kumar's claim that the trial court erred in denying a setoff based on plaintiff's pretrial settlement with the real estate defendants.

Section 2(c) of the Contribution Act (Ill. Rev. Stat. 1991, ch. 70, par. 302(c)) provides:

"When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater."

When plaintiff settled with the real estate defendants, she had two claims pending against them: one was for wrongful death and the other was a survival action. A wrongful death action is brought to compensate the surviving spouse and next of kin of a decedent for the pecuniary loss that they sustained. (Ill. Rev. Stat. 1991, ch. 70, par. 2.) A survival action is brought pursuant to the Survival Act (Ill. Rev. Stat. 1991, ch. 110½, par. 27—6) for the benefit of the decedent's estate. The statute permits the representative of the estate to prosecute a claim for personal injury that the decedent could have brought had he lived. The recoverable damages are those compensatory damages which the decedent would have been entitled to had he prosecuted the claim. *Fountas v. Breed* (1983), 118 Ill. App. 3d 669, 455 N.E.2d 200.

Clearly the settlement between plaintiff and the real estate defendants extinguished both claims; however, the trial court did not allocate the settlement between the wrongful death claim and the survival action in its order dismissing the real estate defendants and finding that the settlement was in good faith. As this court recently noted in *Foster v. Kanuri* (1992), 241 Ill. App. 3d 677, 681, 608 N.E.2d 8, 11:

"When reviewing a proposed settlement, the trial court should consider, in addition to the good-faith elements, the per-

centage of the settlement to be allocated with respect to the particular cause of action. When a lawsuit involves claims under both the survival and wrongful death statutes, the allocations should be made according to the claim. Expenses for conspicuous pain and suffering, expenses and loss of earnings of the decedent up to his or her date of death should be allocated to the survival action and the loss of benefits of the survivors should be allocated to the action for the wrongful death.''

■■ In this case, the required allocation of the settlement was critical. Because Dr. Kumar was found liable to plaintiff on the wrongful death claim, to the extent that plaintiff's settlement with the real estate defendants was for the wrongful death action, the trial court erred in denying Dr. Kumar the setoff which he was entitled to under the plain language of section 2(c) of the Contribution Act.

Accordingly, we affirm the trial court's denial of plaintiff's post-trial motion in all respects; but, we reverse the trial court's denial of Dr. Kumar's motion for a setoff and remand this cause to the trial court with directions to allocate the settlement between the wrongful death claim and the survival action and then to grant Dr. Kumar a setoff against the judgment entered against him in an amount equal to that portion of the settlement allocated to the wrongful death claim.

Affirmed in part; reversed in part and remanded with directions.

JOHNSON and CAHILL, JJ., concur.