**Frank R. SAIA and Diane Saia, Plaintiffs,**

v.

**SEARS ROEBUCK AND CO., INC. and Escalade Sports, Inc., Defendants.**

**No. CIV.A. 98–30034–KPN.**

United States District Court,
D. Massachusetts.

April 27, 1999.

Frank R. Saia, Springfield, MA, Colin Keefe, Frank R. Saia, for Frank R. Saia, Diane Saia, Plaintiffs.

Christine M. Netski, Keith S. Brown, Sugarman, Rogers, Barshak & Cohen, Joel F. Pierce, Pierce, Davis, Fahey & Perritano, Joel F. Pierce, Pierce, Davis, Fahey & Perritano, Boston, MA, for Sears, Roebuck & Co., Inc., Escalade Sports, Inc., Defendants.

## MEMORANDUM WITH REGARD TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF STAN SMITH ON THE ISSUE OF HEDONIC DAMAGES (Docket No. 29)

NEIMAN, United States Magistrate Judge.

Defendants Sears Roebuck and Co., Inc. and Escalade Sports, Inc. ("Defendants"), have moved to exclude the testimony of Plaintiffs Frank R. Saia and Diane Saia's expert witness, Stan V. Smith, Ph.D. ("Dr. Smith"), on the issue of hedonic damages, i.e., the "loss of enjoyment of life." Defendants claim that the proffered testimony is not admissible as scientific or technical evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as clarified by *Kumho Tire Co., Ltd. v. Carmichael*, —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In addition, Defendants assert that the proffered testimony will not assist the jury in understanding the evidence or determining a fact in issue as required by Federal Rule of Evidence 702.[1]

---

1. With the parties' consent, the case has been assigned to the court pursuant to 28 U.S.C.

After hearing argument on Defendants' motion, and in anticipation of the trial due to begin on May 3, 1999, the court found underlying merit to the motion and scheduled a *Daubert/Kumho* hearing for April 21, 1999. Dr. Smith was the sole witness at the hearing. After consideration of the testimony and in order to facilitate the parties' planning for trial, the court, by margin notation, allowed Defendants' motion that day. The court now sets forth its rationale.

## I. *FACTUAL BACKGROUND*

The instant matter is a personal injury/product liability action wherein Frank Saia ("Saia") alleges that he was injured on October 20, 1997, while erecting a ping-pong table designed and manufactured by Defendant Escalade Sports and sold by Defendant Sears Roebuck. Saia asserts that he suffered a severe injury to his right index finger when the upper joint was amputated by an exposed nip point. As a result of the injury, Saia claims, he has undergone extensive medical and psychological treatment. Diane Saia ("Mrs. Saia"), Saia's wife, has made independent claims for loss of consortium and the negligent infliction of emotional distress. (*See* Amended Complaint (Docket No. 07).)[2]

## II. *DISCUSSION*

### A.

The parties do not dispute that Massachusetts substantive law applies to this action. More specifically, the parties agreed and acknowledged at the *Daubert/Kumho* hearing that a jury addressing the extent of Saia's pain and suffering may consider any reduction in the enjoyment of life which the jury concludes resulted or probably will result from the injury.

Plaintiffs seek to have the jury assisted in this endeavor by the testimony of their expert, Dr. Smith, whose expertise has both been accepted and rejected by other courts. (*See* Pl. Opp. (Docket No. 41) Exh. 2.) The proposed testimony in the instant matter has been fairly described as follows:

> Mr.[3] Smith is an economist and President of [Corporate] Financial Group, Ltd. He has a method for calculating the value of life according to a "willingness to pay" model. He bases his calculations on three underlying studies: 1) consumer behavior and purchases of safety devices; 2) wage risk premiums; 3) regulatory cost-benefit analyses. The idea is that decisions in the aggregate, or collective societal decisions, which actually intersect money and risks to life and limb can be used to determine a statistical figure for the value society places on life. A jury can then employ that figure as a benchmark of some kind in assessing the particular loss in the case before it.

*Kurncz v. Honda North America, Inc.,* 166 F.R.D. 386, 388 (W.D.Mich.1996).

In determining whether Dr. Smith should be permitted to testify, the court must apply Federal Rule of Evidence 702 in keeping with the Supreme Court's opinions in *Daubert* and *Kumho Tire.* Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may

§ 636(c) for all purposes, including entry of judgment.

**2.** On August 15, 1999, the court denied, without prejudice, Defendants' motion to exclude Mrs. Saia's emotional distress claim, cautioning, however, that she would be allowed to pursue that claim "only upon presentation of

objective evidence of harm," evidence which had not yet been proffered to the court. (*See* margin notation at Docket No. 30.)

**3.** At the instant hearing, Dr. Smith testified that he received a Ph.D. from the University of Chicago within the last two years.

testify thereto in the form of an opinion or otherwise.

Focusing on "scientific" knowledge, *Daubert* established a two-part test, requiring the court to determine whether the proffered expert evidence is both reliable and relevant. The reliability of the evidence involved a four part inquiry: (1) can the theory or technique at issue be tested; (2) has the theory or technique been subject to peer review; (3) does the theory or technique have a known error rate; and (4) has the theory or technique been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 591–95, 113 S.Ct. 2786. Whether the evidence is relevant, on the other hand, i.e., whether it "fits" the case, requires a determination as to whether the evidence will assist the jury in determining the existence of any fact of consequence. *Id.* at 591–93, 113 S.Ct. 2786. Assuming both relevance and reliability, the evidence still may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

Just one month ago, the Supreme Court addressed *Daubert's* applicability to the testimony of technical and other non-scientific experts. The court concluded that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho*, —— U.S. at ——, 119 S.Ct. at 1171 (quoting Fed. R.Evid. 702). The Court also concluded "that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id.* (emphasis in original). The Court cautioned, however, that "as … stated in *Daubert*, the test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

### B.

In support of its opposition to Defendants' motion in limine, Plaintiffs point to a significant number of cases in which Dr. Smith claims to have testified with respect to "intangible damages." (*See* Pl. Mem. (Docket No. 41) at Exh. 2.) But numbers do not an argument make. *Cf. Joiner*, 522 U.S. at 146, 118 S.Ct. 512 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). As a review of the published case law reveals, quite a number of federal decisions have rejected such expert testimony, in particular Dr. Smith's testimony. The court's own *Daubert/Kumho* analysis of the present record—detailed below—convinces the court that Dr. Smith's proffered testimony in the instant matter should not get to the jury. The cases specifically cited by Plaintiffs in counterpoint do not convince the court otherwise.

This is not to say that hedonic damages could never be a proper subject for expert testimony. In fact, pre-*Daubert*, the First Circuit appeared to recognize a tie between such claimed damages and supportive expert testimony. In *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989), the First Circuit, in a section 1983 civil rights action, affirmed an award of compensatory and punitive damages to a driver of an automobile who was injured when shot by a police officer. Recognizing that the four and one-half million dollar compensatory damage award may have been generous, the court nonetheless agreed with the trial court that "[t]he detailed testimony of plaintiff and his mother

adequately support a substantial amount to compensate him, a young man, for the terrible and constant pain, permanent disability and his loss of enjoyment of life." *Id.* at 580. In reaching this conclusion, the First Circuit made mention of expert medical testimony which showed that the plaintiff would never be able to walk again, could not control his urination or bowel movements, had permanent sexual dysfunction, had developed emotional problems and would probably have a shortened life expectancy by as much as twenty years. *Id.* at 578. Still other testimony of medical and economic experts supported claimed future medical and related expenses, as well as future rehabilitation. *Id.* None of the cited expert testimony in *Gutierrez–Rodriguez*, however, is anything like the testimony offered by Dr. Smith in the present matter.

## C.

Dr. Smith's model for calculating the loss of the enjoyment of life provides an estimate, based on a number of economic studies, for the monetary value of the life of a "statistically average person." Those studies examined incremental pay for risky occupations as well as a multitude of data regarding expenditures for life savings by individuals, industry, and state and federal agencies. The underlying studies surveyed by Dr. Smith in developing his model fall into three general groups: consumer purchases of safety devices, wage risk premiums to workers, and cost benefit analyses of governmental regulations. As Dr. Smith testified, the resulting statistically average value of a life arises from a cost benefit analysis, i.e., how much society is willing to spend in order to save or minimize risk in one's life.

The average value of a life, Dr. Smith concludes from these studies, is between 3 and 3.5 million dollars. For purposes here, he has settled upon a 3.3 million dollar figure. This figure is based on an average thirty-two year-old individual with a remaining life expectancy of approximately forty-five years. This "average" individual, Dr. Smith asserts, is truly "average," making no distinction for either race or gender. As Plaintiffs note, "Dr. Smith's calculation simply assumes the statistical average life and takes the next step of assessing the damages with an adjustment to the relevant individual's age. It only adjusts for race and sex to the extent that those factors impact a life expectancy calculation." (Pl. Opp. at 33.) This average value of a life, Dr. Smith claims, also takes into account the average earnings of an average individual. Thus, the $3.3 million figure is "net of earnings." [4]

To calculate the "quality" of life in a particular case, Dr. Smith proposes a three step analysis. First, he starts with a statistically average value of life, as indicated, of approximately 3.3 million dollars as applied to an average thirty-two year old. This value engenders a yearly average of $113,000, applied, at the second step, to the age of a particular individual. Taking into account the age of that individual, Dr. Smith applies the $113,000 amount to the first year and—based on actuarial tables—projects that yearly figure, discounted to present value, over the individual's remaining life expectancy.

In his report of February 17, 1999, Dr. Smith notes that Saia "is a Caucasian married male, who was born on December 4, 1935, and injured on October 20, 1997 at the age of 61.9." (Def. Mot. Exh. A at 1.) Thus, Mr. Saia will be 63.4 years of age at the estimated trial date, with a remaining life expectancy estimated at 16.7 years based on statistics from the National Center for Health Statistics. *Id.* Rather than attributing an overall value to Saia's re-

---

4. Dr. Smith also uses a range of between 2.5 and 4 million dollars, with the lower range calculated based on what he described as "lesser injuries," and the higher range based on what he describes as "catastrophic injuries." Based on its utility, Dr. Smith testified, money has a different value with regard to a minor injury than it does with respect to a major injury.

maining life, however, Dr. Smith provides tables which "assume [a] rating by a psychiatrist or a psychologist or trier-of-fact of 10 percent to 20 percent reduction in the ability [of Saia] to lead a normal life." *Id.* at 2. "The diminished capacity to lead a normal life," Dr. Smith states, "reflects the impact of career, social and leisure activities, the activities of daily living, and the internal emotional state." *Id.* The tables in Dr. Smith's report also assume a life expectancy of 80.1 years and a "central tendency of the range of the economic studies," which he estimates to be approximately 3.2 million (rather than the 3.3 he testified to) in 1999 dollars. *Id.* at 3.

It became clear at the *Daubert/Kumho* hearing, that the ten to twenty percent range utilized in Dr. Smith's report was in fact arbitrary. As Dr. Smith testified, the ten to twenty percent range, and the resulting calculations, were simply illustrative. There were only two ways, Dr. Smith testified, to establish an actual rate for the diminished value of life. This takes place at the third step of Dr. Smith's proposed methodology. First, a "specific psychosocial evaluation" could be done by a psychiatrist or psychologist, for example, and given to a jury. As far as Dr. Smith understood, this type of evaluation has not been done in the instant case.[5]

Second, as the court understands Dr. Smith's testimony, the jury itself could establish the diminution figure. To do this, Dr. Smith testified, his calculations could be given to the jury as "a tool, an aid or a guide." The jury would be told that the ten percent calculation, which Dr. Smith estimated to be worth $173,612 at the "lower end of impairment range," and the twenty percent calculation, which Dr. Smith estimated to be valued at $347,221 at the "upper end of impairment range," (*see id.* at 5), were simply illustrative. The jury would come up with its own percentage regarding Saia's loss of the enjoyment

of life, Dr. Smith suggested, and apply it to a chart, which Dr. Smith is willing to provide, to come to a final figure. The same process could be done for Mrs. Saia.

### D.

Plaintiffs have not borne their burden of showing that Dr. Smith's proposed testimony is any more acceptable to this court than it was to other courts which have found it wanting under *Daubert.* The fact that *Kumho* has now made clear that the *Daubert* factors may be applied to technical as well as scientific evidence only enhances the court's opinion.

In *Kurncz,* for example, the court reasoned that the willingness-to-pay method of calculating hedonic damages, upon which Dr. Smith primarily relies, includes assumptions that cannot be validated. Those assumptions include an assumption that people consider and accurately evaluate the risks they face when making purchases or choosing employment, an assumption that people have freedom to choose whether to work in a high risk or low risk job, and the assumption that risk calculation governs decision making. *Kurncz,* 166 F.R.D. at 388. "The willingness-to-pay model on the issue of calculating hedonic damages is a troubled science in the courtroom, with the vast majority of published opinions rejecting the evidence." *Id.* (citing *Ayers v. Robinson,* 887 F.Supp. 1049 (N.D.Ill.1995); *Hein v. Merck & Co., Inc.,* 868 F.Supp. 230 (M.D.Tenn.1994); *Sullivan v. United States Gypsum Co.,* 862 F.Supp. 317 (D.Kan.1994); *Mercado v. Ahmed,* 756 F.Supp. 1097 (N.D.Ill.1991), *aff'd,* 974 F.2d 863 (7th Cir.1992); *Sterner v. Wesley College, Inc.,* 747 F.Supp. 263 (D.Del.1990); *Patch v. Glover,* 248 Ill. App.3d 562, 188 Ill.Dec. 13, 618 N.E.2d 583 (Ill.App.1993)). The *Kurncz* court concluded that "in the end, Mr. Smith's method is nothing more than a compilation of lay responses." *Id.* at 390.

---

**5.** The loss of functioning attributable to Saia by his physician was simply "bio-medical," which, according to Dr. Smith, did not translate into a diminution of work and leisure activity.

Similarly, in *Ayers,* the court found that "the entire process of selecting and adjusting willingness-to-pay data has proved unreliable because of the widely divergent views among economists concerning what does and does not constitute a sound study." *Ayers,* 887 F.Supp. at 1051. After noting that Dr. Smith referred to Adam Smith's 1776 work, An Inquiry into the Nature and Causes of the Wealth of Nations, the *Ayers* court commented critically that, "[b]y seeking to portray as a genealogical credential the exceedingly tenuous connection between his willingness-to-pay methodology and Adam Smith's Wealth of Nations, Stan Smith coats his novel use of a quite recent economic theory with a vintage veneer that it does not deserve." *Id.* at 1063. In the case at bar, in fact, Dr. Smith testified that only twenty-five percent of his profession uses hedonic damages analysis, "up from zero percent ten years ago."

In *Sullivan,* the court noted that the willingness-to-pay methodology does not take into account any facts about the particular plaintiff. "The studies relied upon by Mr. Smith," the court stated, "do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for calculating damages for both Mr. and Mrs. Sullivan's loss of enjoyment of life." *Sullivan,* 862 F.Supp. at 321. The court continued:

> Mr. and Mrs. Sullivan suffered distinct and different damages (Mrs. Sullivan died, Mr. Sullivan faces living without the support of companionship of his wife), yet, under Mr. Smith's analysis the damages are identical, save only for adjustment for differing the expectancy. The court finds that the proffered testimony of Mr. Smith simply fails in any real terms to provide a measure of the loss and affection to Mr. Sullivan due to his wife's death.

*Id.* The court concluded that it simply did not believe "that the distinct and personal relationship that Mr. Sullivan enjoyed with his wife has commercial value which can be determined by comparison to the alleged value that society places on the contributions of a statistically average person." *Id.*

Similarly, in *Mercado,* the trial court rejected the willingness-to-pay methodology because "there is no basic agreement among economists as to what elements ought to go into the life valuation," and because the willingness-to-pay evidence is founded on the consensus "of persons who are no more expert than are the jurors on the value of the lost pleasure of life." *Mercado,* 756 F.Supp. at 1103. The Seventh Circuit affirmed, commenting that "we have serious doubts about [Stan Smith's] assertion that the studies he relies upon actually measure how much Americans value life." *Mercado,* 974 F.2d at 870. The circuit court went on to note that many non-economic factors influence purchases of safety items and choices of occupations.

Interestingly enough, one of the primary cases on which Plaintiffs themselves rely, a copy of which they provided to the court, does not provide ringing support for Dr. Smith's testimony. *See Ron Smith and Lucy Smith v. Ingersoll–Rand Co.,* Civil Action No. 94–1083 (D.N.M. Nov. 14, 1997). Finding that *Daubert* did not apply, the court deemed Dr. Smith to be a "nonscientific expert" whose testimony "is not one that requires the rigors of the scientific process; it falls into the category of social science, a discipline dealing with human behavior and societal values that does not easily lend itself to scientific evaluation." *Id.* at 3. Even "recognizing that the touchstone of Rule 702 admissibility is helpfulness to the trier of fact," the court found "troubling" that the starting points of Dr. Smith's analyses are studies that differ greatly in their valuation of a statistical human life. *Id.* "This lack of reliability," the court continued, "shows the potential for Stan Smith's valuation testimony to be both unhelpful and confusing to the jury." *Id.* at 4. As a result, the court did

not allow Dr. Smith to place a value on Ron and Lucy Smith's hedonic damages, although he was permitted, as a forensic economist, to quantify Ron Smith's loss of wages and the value of lost household services.

The only apparent reason why Plaintiffs may be relying on the *Ron Smith* case is that the trial court indicated that Dr. Smith could testify, "only testify," about the "meaning of hedonic damages," although he could not refer to monetary values. *Id.* That, as it turns out, is even less than Plaintiffs are proposing here. In any case, this court does not believe that such limited testimony is appropriate. Even without *Daubert* analysis of the economic testimony at hand, the court finds, per *Kumho,* that the testimony fails to meet the standards of Rule 702.

### E.

Hedonic damages theory has attracted wide attention in legal journals and numerous articles have been authored on the subject in the Journal of Forensic Economics. Dr. Smith himself has authored several articles as well as a text entitled *Economic–Hedonic Damages: A Practice Book for Plaintiff and Defense Attorneys* (Anderson Publishing Co.1990).[6] (*See* Pl. Exh. 1.) Despite many favorable articles, the sociological and economic foundations of hedonic damages have been as often assailed as lacking any verifiable basis. *See McGuire v. City of Santa Fe,* 954 F.Supp. 230, 233 (D.N.M.1996) (citing Thomas Havrilesky, *Valuing Life in the Courts: An Overview,* 3 J. Forensic Econ. 71 (1990)). Simply put, "hedonic damages as an economic theory, has not received the level of professional exposure and scrutiny the [Supreme] Court envisioned in *Daubert.*" Joseph A. Kuiper, *The Courts, Daubert, and Willingness–To–Pay: The Doubtful Future of Hedonic Damages Tes-*

timony under the Federal Rules of Evidence, 1996 U. Ill. L.Rev., 1197, 1234.

Of course, as Plaintiffs point out, citing *A Woman's Choice—East Side Women's Clinic v. Newman,* 904 F.Supp. 1434, 1460 (S.D.Ind.1995), "*Daubert* does not require a scientific opinion to be beyond criticism before it becomes admissible." Still, recognizing that the *Daubert* factors may not be strictly applicable to social science testimony, the court does not believe that Dr. Smith's testimony survives even a modified *Kumho* analysis.

As the Supreme Court recognized in both *Daubert* and again in *Kumho,* the ability to verify a hypothesis is at the core of a court's inquiry. Here, as indicated, there is significant reason to doubt the testability of hedonic damage calculations based on Dr. Smith's willingness-to-pay models. The court finds it too large a leap to accept that the amount that individuals are willing to pay to reduce the probability of death accurately reflects the value society places on the average human life. Yet, even were the court to accept that proposition, the conclusion does not prove that the amount—which Dr. Smith calculates at $3.3 million—accurately reflects the value society places on the *quality* of human life. As the court posited in *Hein,*

> Many of the predictions or assumptions of economists in damages testimony can be validated in retrospect, if not otherwise. For instance, predicted rates of inflation, predicted salary escalations, average life expectancies, average work life expectancies, average interest rates, can all be looked at years down the line to determine if we were correct in allowing expert estimates of economic loss .... No such retrospective validation is possible ... [with] hedonic damages. Speculative assumptions remain speculation.

for forensic economists.

---

**6.** At the hearing, Dr. Smith testified that, despite its title, the text was really most useful

*Hein*, 868 F.Supp. at 232. *See also Estate of Sinthasomphone v. City of Milwaukee*, 878 F.Supp. 147, 152 (E.D.Wis.1995) ("The problem with Mr. Smith's testimony is that he is attempting to quantify something which cannot truly be determined: what is the value of a human life? He rests his determination on a number of studies which are in themselves grounded in the science of economics—which, in the first place, is not quite like physics."). Indeed, in the case at bar, Dr. Smith acknowledges that his theories cannot be tested, excusing this deficiency with the statement that the loss of household services cannot be tested either.

In addition, the court questions whether Dr. Smith's theory meets the requirement of general acceptability. As indicated, many federal courts have simply rejected expert testimony on hedonic damages, in particular Dr. Smith's. *See Ayers*, 887 F.Supp. at 1054 ("all five principle parts of Smith's proposed testimony on the issue of hedonic damages are inadmissible under Rule 702 or Rule 403 or both."); *Sullivan*, 862 F.Supp. at 321 (Smith's testimony would probably invade province of jury and is not amenable to analytical precision); *Kurncz*, 166 F.R.D. at 388–89 (rejecting Smith's proffered testimony as unreliable, unhelpful and inadmissible); *Brereton v. United States*, 973 F.Supp. 752, 758 (E.D.Mich.1997) (Smith's testimony found to be "unreliable, irrelevant, and unhelpful to the factfinder regarding the evaluation of plaintiffs' damages for loss of society and companionship" under *Daubert*). Having carefully considered Dr. Smith's testimony in the case at bar, the court is not convinced otherwise.

## F.

■ Finally, and perhaps most importantly, the court finds that Dr. Smith's testimony will not assist the jury in understanding the evidence or determining any fact in issue. Despite a report in which he attributes a monetary range to both Saia's and Mrs. Saia's loss of the enjoyment of life, Dr. Smith himself acknowledged in testimony that the loss of enjoyment of life was "far more complex" and that the calculations should be made by the jury, absent a targeted psychiatric or psychological analysis. In fact, in his expert report, Dr. Smith acknowledges that "[a] trier-of-fact may weigh other factors to determine if these estimated losses for Frank Saia should be adjusted because of special qualities or circumstances that economists do not as yet have a methodology for analysis." (Pl. Opp. Exh. 1 at 3.) As Plaintiffs explain,

> Dr. Smith will not tell the jury what amount of money should be awarded to the [sic] Frank Saia and Diane Saia. Rather, he will testify as to a benchmark number calculated by application of the numerous studies upon which his work is based. Further, he will teach the jury about the other relevant considerations that may go into its ultimate conclusion from an economic perspective. What Dr. Smith will do is acquaint the jury with an area of economic study with which the average person is not familiar.

(Pl. Opp. at 19.) Thus, Dr. Smith simply should be permitted to give the jury "a tool, a model and a guide" for its deliberation. As Dr. Smith stated, it would be akin to giving the jury a "bluebook" value of a car and asking it to make adjustments based on the car's mileage and condition.

Dr. Smith's bluebook analogy, while clever, does not hold up under scrutiny. Each car model is essentially the same when it rolls off the assembly line and the valuation given to it as the years go by is based on that baseline. In the court's opinion, the same cannot be said of "average" thirty-two year-olds who, in Dr. Smith's estimation, are worth a standard $3.3 million.

Interestingly enough, Dr. Smith testified that, before he could apply the average calculation to Saia's case, he had to determine whether any of the evidence provided to him in preparation for his report indicated that Saia "would *not* be an average

person." Only upon making that determination, Dr. Smith testified, could he "safely" utilize his model. Neither Dr. Smith's expertise nor the methodology which led him to that conclusion were specifically described. He simply referred to his one hour telephone interview of Saia.[7] In any case, once determining that there was nothing to indicate that Saia would not be an average person, Dr. Smith calculated Saia's age and life expectancy and came up with a value for Saia's remaining life. It is for the jury, Dr. Smith concedes, to decide the actual diminution of the quality of that life as a result of the mishap.

The court does not find Dr. Smith's proffered opinion to be sufficiently reliable for the jury to obtain any value from hearing his testimony. If it is for the jury to decide the question, the court believes, then it should decide it from the beginning. The bluebook value which Dr. Smith wants to attribute to Saia, and Mrs. Saia for that matter, would not be useful. As one commentator has opined,

> The fact that hedonic damages estimates are not derived from facts about the victims life is utterly dispositive of the question of fit. According to hedonic damages experts, the key issue to be decided by the jury is how much money is required to compensate the victim for the enjoyment of life taken from him by the tort feasor. But anonymous life values, like those derived from hedonic damages estimates, have no bearing whatsoever on the enjoyment of life lost by the victim.

Kuiper, 1996 U. Ill. L.Rev. at 1243 (citing Havrilesky, *The Misapplication of the Hedonic Damages Concept to Wrongful Death and Personal Injury Litigation,* 6 J. Forensic Econ. 93, 95 (1993)). *See also Hein,* 868 F.Supp. at 233 ("it seems a rather callous and unhelpful perspective when the issue before the factfinder is the loss of enjoyment of life of a particular individual. It seems obvious to this Court that some people enjoy life more than

others.") "In fact," the commentator continues,

> hedonic damages estimates have so little connection to the value of the individual's life that they are entirely interchangeable between victims. For example, the hedonic estimate of a healthy, 49–year–old mother of two, who is happily married and active in hobbies and community life would be the same as that of an unhappy, unhealthy, suicidal 49–year–old woman. Most of us would find such a suggestion absurd; after all, do all people of the same age and gender necessarily derive the same satisfaction from living?

*Kuiper,* 1996 Univ. Ill. Law Rev. at 1244. "Under *Daubert,* evidence will not be admitted into federal courts unless it is scientific knowledge, meaning, among other things, that it bears valid scientific connection to the fact in dispute. This cannot mean, as hedonic damages proponents seem to wish it to mean, that scientifically invalid evidence can be introduced to the jury so long as its shortcomings can be offset by other evidence." *Id.* at 1246. *Compare* Thomas J. Airone, *Hedonic Damages and the Admissibility of Expert Testimony in Connecticut after Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 15 Quinnipiac L.Rev. 235 (1995). In the court's opinion, this holds true even if Dr. Smith's testimony is considered technical, not scientific.

At bottom, the court believes that the qualitative and quantitative value of the loss of Saia's enjoyment of life, as it might be included in the pain and suffering he may have endured, can be calculated independently by the jury without the assistance, if not the confusion, of Dr. Smith's proffered testimony. As presently offered, the testimony is simply not sufficiently plaintiff-specific to make it helpful to the jury. *See Kumho,* —— U.S. at ——, 119 S.Ct. at 1177 ("The relevant issue was whether the expert could reliably deter-

---

7. The court is not aware if Dr. Smith had a similar interview with Diane Saia.

mine the cause of *this* tire's separation."). It goes practically without saying that the testimony with respect to Mrs. Saia is even further afield. *Cf. Brereton,* 973 F.Supp. at 758 ("even if one were to accept Mr. Smith's testimony as producing a scientifically reliable value of the decedent's life, the conclusion that this figure provides a value of that person's relationship to his or her survivors is unfounded.").

## III. *CONCLUSION*

For the reasons described, the court allowed Defendants' motion in limine.